```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                                                 :
CITIGROUP INC.,                                                  :
                                                                 :
                              Petitioner,                        :
                                                                 :   21 Civ. 10413 (JPC)
             -v-                                                 :
                                                                 :   OPINION AND
LUIS SEBASTIAN SAYEG SEADE,                                      :   ORDER
                                                                 :
                              Respondent.                        :
                                                                 :
-----------------------------------------------------------------X
```

JOHN P. CRONAN, United States District Judge:

Petitioner Citigroup Inc. ("Citigroup") has asked the Court to compel arbitration against Respondent Luis Sebastian Sayeg Seade ("Sayeg") and to enjoin Sayeg from pursuing, or continuing to pursue, any action in Mexico in violation of his contractual obligation to arbitrate certain disputes. Sayeg's employment with Citigroup's wholly-owned indirect subsidiary concluded around early 2020 upon his execution of a Termination and Release, which expressly incorporated binding agreements to arbitrate any disputes over various incentive plans. He nonetheless since commenced litigation in Mexico bringing claims that appear to relate to those very plans. The Court granted a temporary restraining order, followed by a preliminary injunction, requiring that Sayeg immediately cease the prosecution of any such proceedings outside of arbitration. Sayeg failed to oppose Citigroup's prior applications for injunctive relief, nor has he opposed the petition to compel arbitration.

For reasons that follow, the Court grants Citigroup's unopposed petition to compel arbitration and stays this case pending that arbitration. The Court also continues the preliminary injunction currently in place pending arbitration, except that, given today's compulsion order,

Sayeg also must withdraw any pending claims in Mexico that fall within the scope of the arbitration agreements.

## I. Background

### A. Factual Overview

The following facts are taken from the allegations in the Petition and Complaint, the documents it incorporates by reference, and declarations including attached exhibits submitted by Citigroup.[1]

Sayeg was employed by Banco Nacional de México, S.A., Integrante del Grupo Financiero Banamex ("Banamex"), which is a wholly-owned indirect subsidiary of Citigroup organized under the laws of Mexico and with its principal place of business in Mexico. Dtk. 1 ("Petition") ¶ 14; Dkt. 8 ("Sirago Declaration") ¶ 3. During Sayeg's employment with Banamex, Citigroup had in place various incentive plans, which granted incentive compensation to its employees. Those plans include the Discretionary Incentive and Retention Award Plan ("DIRAP"), the Stock Incentive Plan ("SIP"), and the Deferred Cash Award Plan and a Capital Accumulation Program ("DCAP"), which is maintained by the SIP (collectively, the "Plans"). *See* Petition, Exh. A at 2; Sirago Declaration ¶¶ 5-6. Sayeg and Citigroup also entered into agreements in 2018 and 2019, among other years, under which Citigroup granted Sayeg deferred stock awards and deferred cash awards that vested over four years after issuance under the Plans (the "Award Agreements"). Sirago Declaration, Exhs. 2 ("2018 Award Agreement"), 5 ("2019 Award Agreement"). These Award Agreements contain identical arbitration clauses, which read as follow:

> **Arbitration.** Any disputes related to the Awards will be resolved by arbitration in accordance with the Company's arbitration policies. In the absence of an effective

---

[1] "Courts deciding motions to compel apply a standard similar to the one applicable to a motion for summary judgment," meaning that they can consider relevant evidence outside the complaint. *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 281 n.1 (2d Cir. 2019).

arbitration policy, Participant understands and agrees that any dispute related to an Award will be submitted to arbitration in accordance with the rules of the American Arbitration Association.  To the maximum extent permitted by law, and except where expressly prohibited by law, arbitration on an individual basis will be the exclusive remedy for any claims that might otherwise be brought on a class, representative or collective basis.  Accordingly, Participant may not participate as a class or collective action representative, or as a member of any class, representative or collective action, and will not be entitled to a recovery in a class, representative or collective action in any forum.  Any disputes concerning the validity of this class, representative or collective action waiver will be decided by a court of competent jurisdiction, not by an arbitrator.

2018 Award Agreement § 14(a); 2019 Award Agreement § 14(a).

Sayeg, a Mexican national and resident, formerly worked as a Managing Director at Banamex. Dkt. 9 ("De La Vega Declaration") ¶ 4; Sirago Declaration ¶ 4.  His employment ended in 2019[2] when he and Banamex executed a Termination and Release.  Petition ¶ 15; De La Vega Declaration ¶ 4.  Pursuant to that Termination and Release, Sayeg was paid $71,526,366.00 Mexican Pesos (the equivalent of approximately $3.5 million in U.S. dollars), in exchange for a general release in favor of both Banamex and Citigroup.  De La Vega Declaration, Exh. 1 ("Termination and Release") § 3.  In the Termination and Release, Sayeg "grant[ed] the broadest release of obligations allowable by law to [Banamex] and/or Citigroup Inc. and/or any related Company."  *Id.*  Sayeg also committed not to file suit in Mexico or the United States against Banamex or Citigroup, as well as against any plan administrators, plan committees, and plan representatives.  *Id.* § 6.

---

[2] Citigroup alleges in the Petition that "[c]ertain disputes arose concerning Sayeg's conduct in the course of his employment, and Sayeg and Banamex negotiated over the terms on which Sayeg would resign."  Petition ¶ 15; *accord* De La Vega Declaration ¶ 4 ("A dispute between Mr. Sayeg and Banamex arose concerning Mr. Sayeg's conduct in the course of his employment, which resulted in Mr. Sayeg being asked to resign.  Following extensive negotiations, Mr. Sayeg and Banamex agreed on the terms of his departure, and they entered into a comprehensive Termination Agreement and Release dated January 7, 2020 . . . .").

The Termination and Release also incorporated and confirmed the arbitration clauses in the Award Agreements:

> The parties agree that, as a possible benefit following the voluntary termination of the employment relationship binding them, any dispute regarding the applicability or not applicability of the benefit will be submitted to the arbitration processes established in the Plan or Program.

*Id.* § 4. The Termination and Release was reviewed by the Mexican Labor Board, which approved the agreement as consistent with Mexican law. De La Vega Declaration ¶ 4.

**B.   The Mexican Action and the U.S. Arbitration**

On December 15, 2020, Sayeg initiated proceedings against Banamex in a court in Mexico, which was captioned as *Luis Sebastián Sayeg Seade v. Banco Nacional de México, S.A., Integrante del Grupo Financiero Banamex*, Expediente Número: 1197/2020 (the "Mexican Action"). In the Mexican Action, Sayeg brings, *inter alia*, claims under the DIRAP, the 2018 Award Agreement, and the 2019 Award Agreement and seeks additional awards under the Plans and to invalidate the Termination and Release. *See* De La Vega Declaration ¶ 6, Exh. 2 at 22-25. Although Citigroup established and maintained the Plans, Sayeg has not named Citigroup as a defendant in the Mexican Action.

At an August 27, 2021 hearing before the Mexican Labor Board, Sayeg filed an amended complaint, which added a claim for certain medical and pension benefits allegedly owed to his wife. *Id.* ¶ 10, Exh. 4 at 4-5. The Mexican Labor Board adjourned the hearing until December 1, 2021 to allow Banamex to answer the original complaint and the amended complaint. *Id.* ¶ 11.

At the December 1, 2021 hearing, Banamex raised with the Mexican Labor Board the arbitration provisions in the Plans. *Id.* ¶ 12. Sayeg's lawyers denied any agreement to arbitrate his dispute under the Plans and expressed Sayeg's intent to proceed with the Mexican Action. *Id.* In addition, on December 1, 2021, Banamex answered the original and amended complaint and

4

moved to challenge the Mexican Labor Board's jurisdiction over Sayeg's claims. *Id.* ¶ 13. The Mexican Labor Board has scheduled a hearing on the issue of its jurisdiction over Sayeg's claims for March 9, 2022. *Id.* ¶ 12.

Shortly after that hearing, on December 6, 2021, Citigroup filed a Demand for Arbitration with the American Arbitration Association ("AAA"). Dkt. 7 ("Sills Declaration") ¶ 4, Exh. 1 ("Arbitration Demand"). The arbitration has been captioned, *Citigroup Inc. v. Luis Sebastián Sayeg Seade*, AAA Case No. 01-21-0017-7441 (the "Arbitration"). In the Arbitration Demand, Citigroup seeks declarations that the arbitration clauses of the Plans are valid and binding, that Sayeg has no right to any future benefits under the Plans, and that arbitration provides the sole forum for adjudicating Sayeg's claims in any way relating to or arising out of the Plans. *See* Arbitration Demand ¶¶ 23-27, p. 6-7. Citigroup further seeks in the Arbitration an order enjoining Sayeg from commencing or prosecuting any litigation related to the Plans and directing Sayeg to immediately cease such litigation. *Id.* ¶¶ 28-30, p. 7-8.[3]

**C. This Action**

Citigroup commenced this action on December 6, 2021. Besides seeking an order compelling Sayeg to arbitrate any disputes between the parties in the Arbitration, Citigroup requested the following injunctive relief:

(a) enjoining and restraining Sayeg, together with his officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with Sayeg or any of his officers, agents, servants, employees, or attorneys, from commencing or prosecuting any action or proceeding, in Mexico or elsewhere, arising out of or related to:

(i) Citigroup's Discretionary Incentive and Retention Award Plan, as amended and restated effective as of January 1, 2015 and Citigroup's Capital Accumulation Program and Deferred Cash

---

[3] At a conference on January 20, 2022, counsel for Citigroup confirmed that the Arbitration Demand has been served on Sayeg and that Sayeg has not appeared in the Arbitration.

> Award Plan each awarded to Sayeg on February 14, 2019 and February 15, 2018 (collectively, the "Plans") other than in the arbitration now pending in New York entitled: <u>Citigroup Inc. v. Luis Sebastián Sayeg Seade</u>, AAA Case No. 01-21-0017-7441;
>
> (b) directing Sayeg to immediately cease the prosecution of and dismiss any such proceeding . . . .

Petition at 8. Simultaneous with the Petition, Citigroup also filed a proposed order to show cause and a temporary restraining order.

On December 7, 2021, the Court requested additional briefing on the requested temporary restraining order. Dkt. 12. The Court set December 10, 2021 as the deadline for briefing from Citigroup and December 15, 2021 as the deadline for any responsive briefing from Sayeg, and scheduled a telephonic hearing on Citigroup's temporary restraining order application for December 17, 2021. *Id.* On December 8, 2021, Citigroup filed a declaration attesting that service of the summons and Petition, supporting papers, and the Court's December 7, 2021 Order was made on Sayeg by email, Federal Express, and LinkedIn direct message, as well as on Omar Villalobos Navarrete ("Villalobos"), Sayeg's counsel in the Mexican Action, by Federal Express. Dkt. 17. Citigroup filed its supplemental submissions on December 10, 2021, Dkts. 18, 19, which were served by email and Federal Express on Sayeg and by Federal Express on Villalobos that same day, Dkt. 21. Sayeg, however, neither submitted any responsive briefing nor appeared at the December 17, 2021 hearing.

At the December 17, 2021 hearing, the Court found that Citigroup made a sufficient showing for injunctive relief. Dkt. 24. Later that day, the Court entered a temporary restraining order that provided:

> pending the hearing of petitioner's application for a preliminary injunction, Sayeg, together with his agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with Sayeg or any of his agents, servants, employees, or attorneys, pursuant to Rule 65(b) of the Federal Rules of Civil

6

> Procedure, are temporarily RESTRAINED AND ENJOINED from commencing or further prosecuting any action or proceeding, in Mexico or elsewhere, against Citigroup, arising out of or relating to the Plans, other than in the Arbitration . . . .

Dkt. 20 at 2. The Court further scheduled a telephonic hearing to show cause why a preliminary injunction should not issue for December 22, 2021. *Id.* at 1-2. On December 17, 2021, Citigroup served the temporary restraining order and notice of the December 22, 2021 show cause hearing by email and Federal Express on Sayeg and by Federal Express on Villalobos. Dkt. 21.

At the December 22, 2021 hearing, at which Sayeg also did not appear, the Court again found that the standards for injunctive relief were met, granted the requested relief in part, and reserved ruling in part. Dkt. 28. The Court subsequently entered a preliminary injunction under Rule 65(a) that:

> enjoin[ed] and restrain[ed] Sayeg, together with his officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with Sayeg or any of his officers, agents, servants, employees, or attorneys, from commencing or prosecuting any action or proceeding, in Mexico or elsewhere, arising out of or related to Citigroup's Discretionary Incentive and Retention Award Plan, as amended and restated effective as of January 1, 2015 and Citigroup's Capital Accumulation Program and Deferred Cash Award Plan each awarded to Sayeg on February 14, 2019 and February 15, 2018 (collectively, the "Plans") other than in the arbitration now pending in New York entitled *Citigroup Inc. v. Luis Sebastián Sayeg Seade*, AAA Case No. 01-21-0017-7441.

Dkt. 22 at 1. The preliminary injunction thus directed Sayeg "to immediately cease the prosecution of any such proceeding in Mexico or elsewhere." *Id.* The Court ordered the injunction to "continue until the conclusion of the [] arbitration, or until this Court decides the petition to compel arbitration, whichever is earlier." *Id.* at 1-2. At both the hearing, and in a later order, the Court noted it would consider granting the full injunctive relief that Citigroup sought—specifically, Citigroup's request that the Court direct Sayeg to withdraw the Mexican Action—when it resolved the petition to compel arbitration. *See* Dkt. 24 at 8-9; Dkt. 27 at 2; Dkt. 28 at 6, 17-18.

7

On December 22, 2021, the Court also set a schedule for briefing on the substance of the petition to compel arbitration, setting January 5, 2022 as the deadline for Sayeg's opposition and January 12, 2022 as the deadline for any reply from Citigroup.  Dkt. 22 at 2.  Later that day on December 22, 2021, Citigroup filed a certificate of service attesting that the Court's Order with the preliminary injunction and setting the briefing deadlines for the petition to compel was served on Sayeg by email, facsimile, and Federal Express, and on Villalobos by Federal Express.  Dkt. 23.

On January 11, 2022, the Court ordered the parties to appear for a teleconference on January 20, 2022, to discuss, among other things, "the petition to compel arbitration and whether the Court should continue and expand the Preliminary Injunction."  Dkt. 30.  Three days later, Citigroup filed a declaration attesting that it had served the Court's January 11, 2022 Order on Sayeg and Villalobos.  Dkt. 31.  The Court held the scheduled hearing on January 20, 2022, at which Citigroup appeared but Sayeg did not.  As of the date of this Opinion and Order, Sayeg has not opposed Citigroup's petition to compel arbitration.

## II.  Petition to Compel Arbitration

**A.  Legal Standards**

Under the Federal Arbitration Act ("FAA"), a written agreement to arbitrate is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  "The FAA embodies a national policy favoring arbitration founded upon a desire to preserve the parties' ability to agree to arbitrate, rather than litigate, their disputes." *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 250 (2d Cir. 2019) (quotations and alterations omitted).  Because the FAA "intended to place arbitration agreements upon the same footing as

8

other contracts," arbitration remains "a creature of contract." *Id*. (quotations and alterations omitted).

Before compelling arbitration, this Court must therefore perform a two-step inquiry that looks at contract law principles "governed by state rather than federal law." *Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel*, 346 F.3d 360, 365 (2d Cir. 2003). At step one, the Court looks to see whether "the parties enter[ed] into a contractually valid arbitration agreement." *Id.* At step two, the Court first asks "whether a court or an arbitrator should decide if the dispute falls within the scope of the agreement to arbitrate." *Convergen Energy LLC v. Brooks*, No. 20 Civ. 3746 (LJL), 2020 WL 5549039, at *13 (S.D.N.Y. Sept. 16, 2020) (quotations omitted). "[I]f the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019). But if it does not, then the Court must determine whether "the parties' dispute fall[s] within the scope of the arbitration agreement." *Cap Gemini Ernst & Young, U.S., L.L.C.*, 346 F.3d at 365.

The Court then considers "whether one party to the agreement has failed, neglected or refused to arbitrate." *Beijing Shougang Mining Inv. Co. v. Mongolia*, 11 F.4th 144, 162 (2d Cir. 2021) (quotations omitted). "A party has refused to arbitrate if it commences litigation or is ordered to arbitrate the dispute by the relevant arbitral authority and fails to do so." *Id.* (quotations and alterations omitted).

## B. The Court Compels Arbitration

### 1. Whether the Parties Entered into a Valid Arbitration Agreement

The party moving to compel arbitration has the initial burden of showing that the parties agreed to arbitrate. *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (citing *Almacenes Fernandez, S. A. v. Golodetz*, 148 F.2d 625, 628 (2d Cir. 1945)). While parties may

9

"agree to arbitrate threshold questions such as whether the arbitration clause applies to a particular dispute, . . . parties may not delegate to the arbitrator the fundamental question of whether they formed the agreement to arbitrate in the first place." *Doctor's Assocs., Inc.*, 934 F.3d at 251 (citing *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299–301 (2010)). Or said a bit differently, parties can agree to arbitrate questions about a contract's enforceability and scope but *cannot* agree to arbitrate "questions concerning contract formation." *Id.* (emphasis removed) (citing *Granite Rock Co.*, 561 U.S. at 299). Thus, "[t]o satisfy itself that such agreement exists, the court must resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce." *Granite Rock Co.*, 561 U.S. at 297.

Here, Sayeg and Citigroup entered into unambiguous agreements to arbitrate any disputes relating to the Plans. The Termination and Release—which appears to have been approved by the Mexican Labor Board—states that: "The parties agree that, as a possible benefit following the voluntary termination of the employment relationship binding them, any dispute regarding the applicability or not applicability of the benefit will be submitted to the arbitration process established in the Plan or Program." Termination and Release § 4. The Plans at issue are governed by the Award Agreements. The Award Agreements, in turn, say that "[a]ny disputes related to the Awards will be resolved by arbitration in accordance with the Company's arbitration policies." 2018 Award Agreement § 14(a); 2019 Award Agreement § 14(a). The Award Agreements also provide that the AAA rules will govern any arbitration, further evidencing an intent to arbitrate. 2018 Award Agreement § 14(a); 2019 Award Agreement § 14(a); *see DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 318 (2d Cir. 2021). Taken together, these clauses thus show a broad agreement to arbitrate questions involving the benefits afforded to Sayeg.

### 2. Whether the Parties Delegated the Question of Arbitrability to the Arbitrator

Turning to the next question, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (quotations and alterations omitted). To show "clear and unmistakable evidence of the parties' intent to delegate arbitrability to an arbitrator," parties may point to the arbitration agreement "explicitly incorporat[ing] procedural rules that empower an arbitrator to decide issues of arbitrability." *DDK Hotels, LLC*, 6 F.4th at 318 (quotations omitted). "Because the AAA Commercial Arbitration Rules . . . explicitly empower an arbitrator to resolve questions of arbitrability," the Second Circuit "ha[s] found incorporation of these rules into an arbitration agreement to be relevant in evaluating whether there is clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the arbitrator." *Id.*

But incorporating procedural rules does not *per se* show the intent to delegate. Instead, "context matters." *Id.* So when "the arbitration agreement is broad and expresses the intent to arbitrate all aspects of all disputes, this—coupled with incorporation of rules that expressly empower an arbitrator to decide issues of arbitrability—constitutes clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the arbitrator." *Id.* at 318-19. By contrast, when "the arbitration agreement is narrower, vague, or contains exclusionary language suggesting that the parties consented to arbitrate only a limited subset of disputes, incorporation of rules that empower an arbitrator to decide issues of arbitrability, standing alone, does not suffice to establish the requisite clear and unmistakable inference of intent to arbitrate arbitrability." *Id.* at 319. In other words, when "there is a qualifying provision (whether described as a carve-out or carve-in) that arguably excludes the present dispute from the scope of the arbitration agreement, that provision creates ambiguity regarding the parties' intent to delegate

arbitrability to the arbitrator." *Id.* at 322. This ambiguity then "delays application of AAA rules until a decision is made as to whether a question does or does not fall within the intended scope of arbitration, in short, until arbitrability is decided." *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1032 (2d Cir. 2014).

Here, a plain construction of the relevant arbitration agreements shows an intent to delegate the question of arbitrability to the arbitrator. As noted, the relevant arbitration provisions are "broad and [they] express[] the intent to arbitrate all aspects of all disputes" concerning the Plans. *DDK Hotels LLC*, 6 F.4th at 318-19. The broad arbitration clauses at issue—requiring arbitration for "any dispute regarding the applicability or not applicability of the benefit" and "[a]ny disputes related to the Awards"—are precisely the sort of "categorical, unconditional and unlimited" language that "encompasses a dispute over whether a claim is within the scope of arbitration." *GateGuard, Inc. v. MVI Sys. LLC*, No. 19 Civ. 2472 (JPC), 2021 WL 4443256, at *6 (S.D.N.Y. Sept. 28, 2021) (quotations omitted).

In addition, in the Award Agreements, Sayeg agreed that "[i]n the absence of an effective arbitration policy," "any dispute related to an Award will be submitted to arbitration in accordance with the rules of the American Arbitration Association." 2018 Award Agreement § 14(a); 2019 Award Agreement § 14(a). Article 21 of the AAA's International Dispute Resolution Procedures, which is titled Arbitral Jurisdiction, provides, as relevant here, for the authority of an arbitrator to determine arbitrability:

1. The arbitral tribunal shall have the power to rule on its own jurisdiction, including any objections with respect to arbitrability, to the existence, scope, or validity of the arbitration agreement(s), or with respect to whether all of the claims, counterclaims, and setoffs made in the arbitration may be determined in a single arbitration, without any need to refer such matters first to a court.

2. The tribunal shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause

> shall be treated as an agreement independent of the other terms of the contract. A decision by the tribunal that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

International Centre for Dispute Resolution, *International Dispute Resolution Procedures*, Art. 21, *available at* https://www.icdr.org/sites/default/files/document_repository/ICDR_Rules_1.pdf?utm_source=icdr-website&utm_medium=rules-page&utm_campaign=rules-intl-update-1mar (last visited Jan. 18, 2022). Thus, the broad and express arbitration language in the Termination and Release and the Award Agreements, "coupled with incorporation of rules that expressly empower an arbitrator to decide issues of arbitrability[,] constitutes clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the arbitrator." *DDK Hotels, LLC*, 6 F.4th at 319.

### 3. Whether Sayeg Has Refused to Arbitrate

Lastly, the Court considers whether Sayeg has refused to arbitrate despite never appearing in this case to oppose the Petition. "A party can be deemed to have refused arbitration by filing a lawsuit on a matter that comes within the scope of the arbitration clause." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Seneca Fam. of Agencies*, 255 F. Supp. 3d 480, 489 (S.D.N.Y. 2017) (quotations omitted); *accord Beijing Shougang Mining Inv. Co.*, 11 F.4th at 162. Here, the Court has found that the parties delegated issues of arbitrability to the arbitrator. It thus does not consider whether the entire Mexican Action falls within their arbitration agreement. But in granting injunctive relief, the Court has found that at least part of the Mexican Action's subject matter presumptively overlaps with the parties' arbitration agreement. And at this point, Sayeg has not appeared in the Arbitration. *See Crystal Pool AS v. Trefin Tankers Ltd.*, No. 12 Civ. 9417 (RA), 2014 WL 1883506, at *6 (S.D.N.Y. May 9, 2014) ("[A] party unequivocally refuses to arbitrate . . . by failing to comply with an arbitration demand." (quotations omitted)). The Court thus finds that

Sayeg has refused to arbitrate by bringing the Mexican Action and failing to appear in the Arbitration.

### III. Injunctive Relief

Having ordered that the parties arbitrate, the next question is whether injunctive relief should be continued pending completion of the Arbitration and, if so, in what form. As noted, the current preliminary injunction has ordered Sayeg to cease prosecuting any matter—in Mexico or elsewhere—arising out of or related to the Plans until arbitration concludes or this Petition is decided, whichever is earlier. For the reasons below, the Court continues the current preliminary injunction through the conclusion of the Arbitration and further expands the injunctive relief to additionally require Sayeg to move to withdraw any claims in the Mexican Action arising out of or related to the Plans.

**A. Legal Standards**

While "a federal court may enjoin a party before it from pursuing litigation in a foreign forum," principles of comity counsel that courts should use that power "sparingly." *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 652 (2d Cir. 2004) (quotations omitted). Courts thus must show "care and great restraint" in enjoining a party because "while such an injunction in terms is leveled against the party bringing the suit, it nonetheless effectively restricts the jurisdiction of the court of a foreign sovereign." *Id*. at 652, 655 (quotations omitted). In *China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33 (2d Cir. 1987), the Second Circuit "adopted a test governing the circumstances under which a federal district court could issue an anti-foreign-suit injunction" against foreign actions. *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 119 (2d Cir. 2007). A preliminary anti-suit injunction may be entered only if a party satisfies both *China*

*Trade*'s multi-factor test, as well as the ordinary test for a preliminary injunction. *Software AG, Inc. v. Consist Software Sols., Inc.*, 323 F. App'x 11, 12 (2d Cir. 2009).

Under *China Trade*, the moving party must first show that "(A) the parties are the same in both matters, and (B) resolution of the case before the enjoining court is dispositive of the action to be enjoined." *Karaha Bodas Co.*, 500 F.3d at 119 (quotations omitted). If those threshold requirements are met, courts consider other factors, including "whether the parallel litigation would: (1) frustrate a policy in the enjoining forum; (2) be vexatious; (3) threaten the issuing court's *in rem* or quasi *in rem* jurisdiction; (4) prejudice other equitable considerations; or (5) result in delay, inconvenience, expense, inconsistency, or a race to judgment." *Id.* (quotations and alterations omitted).

To warrant a preliminary injunction, the moving party must "show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (quotations omitted).

**B. *China Trade* Analysis**

The *China Trade* factors strongly favor continuing the preliminary injunction that the Court had entered and expanding the relief to require withdrawing any claims arising out of or related to the Plans in the Mexican Action. First, the parties are the same in the Mexican Action and this case, even though Banamex is the defendant in the Mexican Action, and Citigroup has brought the Petition and initiated the Arbitration. "Decisions interpreting *China Trade* have held that . . . the parties need not be identical in both matters, so long as the 'real parties in interest' are the same." *Deutsche Mexico Holdings S.a.r.l. v. Accendo Banco, S.A.*, No. 19 Civ. 8692 (AKH), 2019 WL

5257995, at *5 (S.D.N.Y. Oct. 17, 2019).  Here, "the parties to the two actions are . . . sufficiently similar to satisfy the first threshold requirement of *China Trade*" because Banamex is a wholly-owned indirect subsidiary of Citigroup.  *Paramedics*, 369 F.3d at 652.

Second, the arbitration that this Court compels today may dispose of claims pending in the Mexican Action.  If the arbitrator rules for Citigroup that the scope of arbitrability includes some of the claims brought in the Mexican Action, that means that certain claims pending in the Mexican Action "are reserved to arbitration and cannot be litigated."  *Travelport Glob. Distrib. Sys. B.V. v. Bellview Airlines Ltd.*, No. 12 Civ. 3483 (DLC), 2012 WL 3925856, at *7 (S.D.N.Y. Sept. 10, 2012) (quotations omitted).  And here, given that the complaint in the Mexican Action includes claims brought under the DIRAP, the 2018 Award Agreement, and the 2019 Award Agreement, *see* De La Vega Declaration ¶ 6, Exh. 2, it seems highly probable that the arbitrator will conclude that at least some claims in the Mexican Action can be brought only in Arbitration pursuant to the arbitration provisions of the Termination and Release and the Award Agreements.

With Citigroup meeting the two threshold *China Trade* factors, the discretionary factors also point in favor of continued injunctive relief.  For one, as the Second Circuit has said, "it is difficult to overstate the strong federal policy in favor of arbitration."  *Arciniaga v. Gen. Motors Corp.*, 460 F.3d 231, 234 (2d Cir. 2006).  And that strong federal policy "applies with particular force in international disputes."  *Paramedics*, 369 F.3d at 654.  Permitting the Mexican Action to continue as to claims covered by the arbitration provisions of the Termination and Release and the Award Agreements would harm these federal interests.

The Mexican Action also "creates a serious risk of inconsistency and a race to judgment." *Bailey Shipping Ltd. v. Am. Bureau of Shipping*, No. 12 Civ. 5959 (KPF), 2013 WL 5312540, at *15 (S.D.N.Y. Sept. 23, 2013) (quotations omitted).  Without an anti-suit injunction, the Mexican

Action could proceed with a disposition despite the likelihood that the arbitrator will later determine that arbitration is mandatory as to some of the claims brought in the Mexican Action. Thus, the *China Trade* factors point toward granting and continuing an anti-suit injunction.

## C. Preliminary Injunction Analysis

The preliminary injunction standards similarly are plainly satisfied, including for reasons previously noted by the Court. First, if the arbitrator were to conclude that certain claims brought in the Mexican Action fall within the mandatory arbitration clauses, Citigroup will have "suffer[ed] irreparable harm if they are forced to litigate rather than arbitrate this dispute." *WTA Tour, Inc. v. Super Slam Ltd.*, 339 F. Supp. 3d 390, 406 (S.D.N.Y. 2018); *see Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 255 F. Supp. 3d at 490 ("Losing the ability to enforce an arbitration agreement is a form of irreparable harm."); *Bailey Shipping Ltd.*, 2013 WL 5312540, at *16 (observing that "losing a right to arbitration constitutes irreparable harm").

Second, the relevant inquiry for the likelihood of success on the merit's requirement is the likelihood "that the claims must be submitted to arbitration." *Id.* In this Opinion and Order, the Court compels arbitration with the arbitrator to determine the scope of arbitrability. As discussed above, Sayeg has brought claims in the Mexican Action that appear to arise from and relate to the Plans. Thus, given the broad scope of the relevant arbitration agreements, there is a likelihood that the arbitrator will agree that certain claims brought by Sayeg in the Mexican Action must be submitted to arbitration.[4]

---

[4] In addition, while unnecessary to the Court's holding based on the above findings, the balance of hardships also tips in Citigroup's "favor because the parties expressly agreed to arbitrate any disputes." *Jolen, Inc. v. Kundan Rice Mills, Ltd.*, No. 19 Civ. 1296 (PKC), 2019 WL 1559173, at *5 (S.D.N.Y. Apr. 9, 2019).

Turning to the scope of injunctive relief, an injunction "should be narrowly tailored to fit specific legal violations." *Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254, 272 (2d Cir. 2011) (quotations omitted). Previously, the Court entered a preliminary injunction enjoining Sayeg, together with his agents, from prosecuting any action or proceeding, in Mexico or elsewhere, concerning the DIRAP, other than in the Arbitration until the conclusion of the Arbitration. Dkt. 22 at 1. That order said that the injunction would "continue until the conclusion of the [] [A]rbitration, or until this Court decides the petition to compel arbitration, whichever is earlier." *Id.* at 2. The Court noted, however, that in resolving the petition to compel, it would "consider whether to extend the preliminary injunction and, if so, whether to order any modifications to the injunction, including Citigroup's request to require Sayeg to dismiss any proceedings in Mexico that fall within the scope of the injunction." Dkt. 27 at 2.

Courts have noted that the "typical" form of relief for "a foreign anti-suit injunction" is to enjoin "commencing or prosecuting" actions that fall within the arbitration agreement "'until the conclusion of the arbitration and the consequent resolution of the still-pending case in the District Court.'" *Amaprop Ltd. v. Indiabulls Fin. Servs. Ltd.*, No. 10 Civ. 1853 (PGG), 2010 WL 1050988, at *9 (S.D.N.Y. Mar. 23, 2010) (quoting *Ibeto Petrochemical Indus. Ltd. v. M/T Beffen*, 475 F.3d 56, 65 (2d Cir. 2007)) (alteration omitted). The Court will therefore extend the preliminary injunction until the conclusion of the Arbitration.

Given the Court's order herein compelling arbitration and its finding of a likelihood that at least some claims in the Mexican Action are reserved for the Arbitration, the Court expands the preliminary injunction to require that Sayeg withdraw any claims in the Mexican Action that fall within the scope of the Arbitration and extends the preliminary injunction pending the completion of the Arbitration. *See id.* at *10 (explaining that having a respondent dismiss claims from a

18

foreign suit "has been granted in other cases where pending foreign litigation threatens, hinders, or delays arbitration proceedings" in the United States).

\* \* \*

Accordingly, pending the completion of the Arbitration, Sayeg is enjoined and restrained, together with his officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with Sayeg or any of his officers, agents, servants, employees, or attorneys, from commencing or prosecuting any action or proceeding, in Mexico or elsewhere, arising out of or related to the Plans other than in the Arbitration until the conclusion of the Arbitration. Sayeg further is ordered, by no later than February 3, 2022, to dismiss without prejudice any claims arising out of or related to the Plans in the Mexican Action[5] and is ordered to arbitrate any dispute with Citigroup or Banamex arising out of or related to the Plans in the Arbitration.

### IV. Stay Pending Arbitration

When arbitration is compelled, "a stay of proceedings [is] necessary after all claims have been referred to arbitration and a stay requested." *Katz v. Cellco P'ship*, 794 F.3d 341, 345 (2d Cir. 2015). Citigroup has asked the Court to stay the case, except for any requests for further injunctive relief or for sanctions for failure to comply with this Court's Orders. The Court will therefore stay this case—except for enforcing the ordered injunctive relief, considering any applications for further injunctive relief, and for considering requests for sanctions for failure to comply with this Court's Orders—pending arbitration.

---

[5] Given that the parties have delegated questions of arbitrability, the arbitrator will decide which claims from the Mexican Action fall within the scope of the arbitration agreements. If the arbitrator finds that Sayeg has dismissed a claim that falls outside the arbitration agreements, Sayeg may then re-plead the claim.

19

## V. Conclusion

For reasons discussed above, the Court compels arbitration and orders Sayeg to participate in the Arbitration. As also ordered above, and will be detailed in a separate Order, Sayeg must cease prosecuting and must withdraw any claims in the Mexican Action arising out of or related to the Plans by February 3, 2022. Citigroup shall file a letter by February 10, 2022, updating the Court on whether Sayeg has withdrawn the required claims from the Mexican Action.

Citigroup shall immediately serve a copy of this Order on Sayeg, with proof of service filed on the docket no later than January 21, 2022.

SO ORDERED.

Dated: January 20, 2022
New York, New York

JOHN P. CRONAN
United States District Judge